## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ESSEX REGIONAL RETIREMENT SYSTEM, on Behalf of Itself and on Behalf of All Those Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC, BNP PARIBAS S.A., CITIBANK, N.A., CITIGROUP, INC., CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, GOLDMAN SACHS GROUP, INC., GOLDMAN, SACHS & CO., HSBC HOLDINGS PLC, HSBC BANK PLC, INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, JPMORGAN CHASE & CO., MARKIT GROUP LTD., MORGAN STANLEY & CO. LLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, and UBS AG,<br><br>　　　　　　Defendants. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

**NATURE OF CLAIM**

1.      Essex Regional Retirement System ("Plaintiff"), on behalf of itself and all those similarly situated, brings this class action for claims arising under the federal antitrust laws to recover damages for the substantial injuries it and others similarly situated have sustained against Defendants identified below arising from Defendants' collusion to restrain competition in the market for credit default swaps ("CDS"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters.

2.      This antitrust class action arises from anticompetitive conduct in the CDS market by many of the largest financial institutions in the world – Bank of America, Barclays, BNP Paribas, Citibank, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS (collectively, "Dealer Defendants") – as well as through entities they own or control, including Defendants International Swaps and Derivatives Association and Markit Group (together with Dealer Defendants, "Defendants"), Co-Conspirator ICE Clear Credit, and the Depository Trust & Clearing Corporation ("DTCC").

3.      A CDS is a derivative financial product. It is a form of insurance against possible default of payment on an underlying debt (*e.g.*, bond or loan) by a defined entity. The protection (insurance) seller promises to pay the protection (insurance) buyer in the event of a predefined default event by the bond or loan issuer. In return, the protection buyer pays a regular fixed payment (or premium) for the duration of the protection period, or up to a default event. The premium is expressed as a percentage of a CDS's notional amount and is denominated in basis points.

4.      Dealer Defendants dominate the CDS market. Dealer Defendants, who occupy the sell side of the CDS market, have been able to use their collective market power to maintain

complete control over the buying, selling and clearing of CDS transactions. CDS market participants on the buy side of CDS transactions ("CDS buyers"), such as Plaintiff and members of the class, have no choice but to purchase CDS from and sell CDS to Dealer Defendants in a manipulated CDS market that enables Dealer Defendants to maintain anticompetitively wide bid-ask spreads on CDS contracts (*i.e.*, what a dealer would be willing to buy and sell a CDS), resulting in higher prices to Plaintiff and the Class. Dealer Defendants profit by retaining the price difference between the buyer and the seller, *i.e.*, the bid-ask spread.

5. CDS are sold over the counter ("OTC"), which means they are bilaterally negotiated agreements between two counterparties. They are not traded on a central exchange, such as the New York Stock Exchange or NASDAQ, which would allow CDS buyers to readily transact with other non-Dealer Defendant CDS market participants. Rather, due to Defendants' successful (and unlawful) efforts to control the sell side of the CDS market, when a CDS buyer wants to purchase or sell a CDS, it must transact through one of the Dealer Defendants.

6. Because they control the entities that collect valuable CDS transaction data, such as Defendant Markit and DTCC, Dealer Defendants were able to create and maintain a distorted market where the pricing of CDS was opaque and CDS buyers had to rely entirely on Dealer Defendants to provide bids and offers for a particular CDS. CDS buyers were deprived of a source of actual, real-time transaction data (thus there was no pre-trade price transparency) and had to rely solely on aggregated and stale data published by Defendant Markit (thus there was virtually no post-trade price transparency). Therefore, CDS buyers were totally dependent on Defendants with respect to critical CDS price information, the withholding of which allowed Dealer Defendants the ability to maintain non-competitive bid-ask spreads throughout the Class Period.

7.       In addition to restricting the availability of CDS pricing data, Defendants also engaged in concerted conduct to stall the entry of a central CDS clearinghouse and block the entry of a CDS exchange trading platform, all with the purpose and intent of maintaining their control of the CDS market and non-competitive CDS bid-ask spreads.

8.       In 2008, some prominent buy-side market participants formed a joint venture that would have brought central counterparty clearing and exchange trading to the CDS market, replacing the existing inefficient, opaque and Defendant Dealer-controlled OTC trading system. Exchange-based trading would have benefited the CDS market by increasing the number of market participants, reducing transaction costs and offering true price transparency. A central clearinghouse would have benefited the CDS market by reducing counterparty risk inherent in the bilateral OTC trading system and paving the way for CDS exchange trading.

9.       In response to the potential introduction of an exchange for trading in CDS, Defendants agreed to avoid participation in the effort and withhold essential licenses necessary for market entry, ultimately succeeding in preventing the establishment of a CDS exchange.

10.      Defendants also stymied the entry of a competing central clearing house for CDS contracts by (1) delaying necessary licensing negotiations to hinder its launch in order to create and launch their own clearing platform; and (2) depriving the competing clearing house of any independent influence it might exert in the CDS market by becoming members and seeking to control its operations.

11.      Through their unlawful conduct, Defendants were able to preserve the existing OTC market structure that they controlled.

12.      Defendants' motives were clear: the success of a competing CDS clearing house or the development of exchange trading in CDS would have essentially removed Dealer

- 3 -

Defendants' stranglehold over the CDS market by making available real-time pricing information to CDS buyers, allowing CDS buyers to transact directly with one another instead of through Dealer Defendants, and compressing the bid-ask spread on any given CDS transaction – in other words, the CDS market would have become more competitive, transparent, and efficient, ultimately lowering prices for CDS buyers.

13.     Defendants' anticompetitive conduct to maintain the current OTC bilateral trading system and control the entire CDS market has caused CDS buyers to pay billions of dollars in artificially high, non-competitive CDS bid-ask spreads to Dealer Defendants during the Class Period.

14.     Not surprisingly, Defendants' anticompetitive conduct attracted the attention of antitrust enforcement agencies in the United States and Europe, which have open and active investigations into the same practices by many of the same entities alleged in this Complaint.

15.     In fact, on July 1, 2013, the European Commission ("EC") issued a statement of objections (detailing the conduct allegedly infringing antitrust laws) to many of the same Defendants here, informing them of its preliminary conclusion that they violated European Union antitrust rules by colluding to prevent exchanges from entering the credit derivatives business between 2006 and 2009, among other things.  The EC sent its statement of objections to Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, UBS, ISDA and Markit, among others.

16.     In sum, Defendants' unlawful conduct permitted them to fix and maintain inflated prices on CDS transactions in the United States from at least January 1, 2008 to the present in violation of federal antitrust laws, causing injury to Plaintiff and the Class.

## JURISDICTION, VENUE, AND COMMERCE

17.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

18.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

19.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, was found, or had agents in this District; a substantial portion of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

20.     The trade and interstate commerce relevant to this action is the market for the purchase and sale of credit protection through CDS.  Each Defendant, directly or through its affiliates or subsidiaries, participated in the market in a continuous and uninterrupted flow of interstate commerce.  The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

21.     Plaintiff Essex Regional Retirement System is a pension fund located in Massachusetts.  Plaintiff administers the public pension system for 48 local entities, including 19 towns, six school districts, 17 housing authorities and six special districts throughout Essex County, Massachusetts.  During the Class Period, Plaintiff was a buy side participant in the market for CDS and entered into transactions for the purchase or sale of CDS with one or more Dealer Defendants.

22.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.  Bank of America is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of Bank of America sit on the boards of ISDA and Markit and on ICE's Risk Committee.  Bank of America is a shareholder of Markit.

23.     Defendant Barclays Bank Plc ("Barclays") is a United Kingdom public company with its corporate headquarters in London, England.  Barclays is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of Barclays sit on the boards of ISDA and ICE's Risk Committee.  Barclays is a shareholder of Markit.

24.     Defendant BNP Paribas S.A. ("BNP Paribas") is a French banking company headquartered in Paris, France.  BNP Paribas maintains offices and transacts business in Chicago, IL.  BNP Paribas is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of BNP Paribas sit on the board of ISDA.  BNP Paribas is a shareholder of Markit.

25.     Defendant Citibank, N.A. ("Citibank") is a wholly-owned subsidiary of Citigroup, Inc.  Citibank is a CDS dealer and acts as counterparty in CDS transactions.  Citibank appoints members to the ICE's Risk Committee.

26.     Defendant Citigroup Inc. ("Citigroup") is a U.S. financial services company headquartered in New York, NY, and is the parent company of Citibank.  Citigroup is a CDS dealer and acted as counterparty in CDS transactions.  Citigroup is a shareholder of Markit.  Representatives of Citigroup sit on the boards of ISDA and ICE's Risk Committee.

27.     Defendant Credit Suisse Group AG ("Credit Suisse") is multinational financial services holding company headquartered in Zurich, Switzerland.  Credit Suisse is a CDS dealer

and acts as counterparty in CDS transactions.  Representatives of Credit Suisse sit on the boards of ISDA and ICE's Risk Committee.  Credit Suisse is a shareholder of Markit.

28.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German public company with its corporate headquarters in Frankfurt, Germany.  Deutsche Bank is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of Deutsche Bank sit on the boards of ISDA and ICE's Risk Committee.  Deutsche Bank is a shareholder of Markit.

29.     Defendant Goldman Sachs Group, Inc., is a United States financial services company, incorporated and headquartered in New York, NY.

30.     Defendant Goldman, Sachs & Co. is a wholly-owned subsidiary of Goldman Sachs Group, Inc. with its principal place of business in New York, NY.  Together with Goldman Sachs Group, Inc., Goldman, Sachs & Co. is referred to in this Complaint as "Goldman Sachs."  Goldman Sachs is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of Goldman Sachs sit on the boards of ISDA and Markit and on ICE's Risk Committee.  Goldman Sachs is a shareholder of Markit.

31.     Defendant HSBC Holdings Plc is a United Kingdom public company with its corporate headquarters in London, England.

32.     Defendant HSBC Bank Plc is a wholly-owned subsidiary of HSBC Holdings Plc.  Together they are referred to in this Complaint as "HSBC."  HSBC is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of HSBC sit on the boards of ISDA and Markit.  HSBC is a shareholder of Markit.

33.     Defendant International Swaps and Derivatives Association ("ISDA") is a financial trade association representing participants in the OTC derivatives market.  ISDA is headquartered in New York, NY, and has offices in Washington D.C., London, Singapore,

Brussels, Hong Kong, and Tokyo. Its members include Dealer Defendants, which control ISDA through seats on its board of directors. ISDA's board is chaired by Stephen O'Connor, who until June 6, 2013 was managing director of Defendant Morgan Stanley, and its members also include executives from Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, and JPMorgan.

34.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware financial holding company headquartered in New York, New York. JPMorgan is a CDS dealer and acts as counterparty in CDS transactions. Representatives of JPMorgan sit on the boards of ISDA and Markit and on ICE's Risk Committee. JPMorgan is a shareholder of Markit.

35.     Defendant Markit Group Ltd. ("Markit") is a private financial information services company headquartered in London, England and is owned, in part, by 16 shareholder banks, including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS. According to 2009 filings at U.K. Companies House, Bank of America (including its subsidiary, Merrill Lynch), Goldman Sachs, JPMorgan, and Royal Bank of Scotland collectively owned 39% of Markit. Dealer Defendants control Markit through seats on its board of directors. During the Class Period, Markit's board members included executives from Bank of America, Goldman Sachs, HSBC, JPMorgan, and Morgan Stanley.

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an American financial services company headquartered in New York, NY. Morgan Stanley maintains offices and transacts business in Chicago, IL. Morgan Stanley is a CDS dealer and acts as counterparty in CDS transactions. Representatives of Morgan Stanley sit on the boards of ISDA and Markit and on ICE's Risk Committee.

37.     Defendant The Royal Bank of Scotland Group Plc ("Royal Bank of Scotland") is a United Kingdom company headquartered in Edinburgh, Scotland with regional offices in Stamford, CT.  Royal Bank of Scotland is a CDS dealer and acts as counterparty in CDS transactions.  Royal Bank of Scotland is a shareholder of Markit.

38.     Defendant UBS AG ("UBS") is a Swiss global financial services company headquartered in Zurich, Switzerland.  UBS is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of UBS sit on ICE's Risk Committee.  UBS is a shareholder of Markit.

39.     Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs or affairs of the corporation or partnership.

## CO-CONSPIRATORS

40.     Co-Conspirator ICE Clear Credit ("ICE") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Atlanta, GA.  It is a subsidiary of IntercontinentalExchange, Inc.  ICE launched on May 9, 2009.  Prior to July 16, 2011, ICE Clear Credit operated as ICE Trust.  Dealer Defendants control ICE's membership and rules through seats on ICE's Risk Committee, which writes or approves ICE's clearing rules.  The membership of ICE's Risk Committee is not publicly disclosed, but during the Class Period it was reported to include senior personnel of Dealer Defendants, including Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS.

41.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

## FACTUAL ALLEGATIONS

**A.     The Market for Trading CDS Contracts**

42.     A credit derivative is a derivative whose value is derived from the credit risk on an underlying asset to which it refers, usually a bond, loan or other financial asset.  CDS are one of the most commonly traded credit derivative products.  A CDS is a bilateral contract between two counterparties:  a buyer of credit protection for some "reference entity" and a seller of credit protection.

43.     Over-the-counter ("OTC") derivatives contracts are contracts that are not traded on an exchange but, instead, are bilaterally negotiated between two counterparties.  CDS are part of the OTC derivative industry.

44.     The following graphic, published by the U.S. Government Accounting Office, shows the relationship between counterparties to CDS transactions:



Source: GAO.

45.     As a market maker, a dealer, such as Dealer Defendants, may both buy and sell a particular CDS, but will do so at different prices.  That is, the dealer will buy (or bid) CDS protection at a lower price than it will sell (or offer) the same protection.  The difference between the bid price and the ask price for a given CDS is the "bid-ask spread."  The bid-ask spread is a major source of the dealers' profits.  The wider the bid-ask spread, the greater the dealers' revenues and profits.

46.     The "protection buyer" makes periodic fixed payments to the "protection seller."  The protection seller, in turn, makes a fixed "contingent payment" to the protection buyer if the reference entity experiences a defined "credit event" during the life of the contract.  Defined credit events are outlined in the CDS contract and typically include the default by the reference entity on the underlying financial instrument.  A default may be a failure to pay, restructuring, or bankruptcy.

47. CDS reference entities may include corporations, sovereigns, municipalities, or structured-finance vehicles. In addition to the entity they reference, CDS are defined by the amount of protection purchased (the notional amount) and the tenure of the contract (*e.g.*, one, three, five, seven, or 10 years).

48. CDS may have one reference entity, in which case they are "single-name CDS," or a basket of reference entities, in which case they are "index CDS." Index CDS account for approximately 50% of all CDS trades. Index CDS are referenced to a portfolio of single-name CDS.

49. Defendant Markit owns the CDS index families CDX and iTraxx, the two most actively traded CDS indices. Both the CDX and iTraxx index families provide several sub-indices for various industries or regions and for different maturities. The CDX family of indices is composed of North American and Emerging Markets reference entities. The CDX indices are broken out between investment grade (IG), high yield (HY), high volatility (HVOL), crossover (XO), and emerging market (EM). The iTraxx family contains European and Asian reference entities. Markit's CDS indices account for about half of all CDS traded.

50. CDS, in essence, are synthetic products that simulate the return of an underlying financial product, where the buyer of credit protection has the equivalent of a short position on the credit asset (*i.e.*, a position that will generate a gain if the value of the asset decreases) and the seller of protection has, in effect, a long position on the credit asset (*i.e.*, a position that will generate a gain if the value of the asset increases).

51. Protection buyers may use the purchase of CDS as a hedging strategy to offset exposure to the risk of loss inherent in lending arrangements or the acquisition of debt securities. For example, imagine that an investor purchases $100 million of bonds in Company X but wants

to eliminate the risk that Company X goes bankrupt and fails to pay its investors. The investor, a protection buyer, can purchase a single-name CDS referencing Company X with a notional amount of $100 million and a tenure of five years. If Company X suffers a credit event (as defined in the contract) during the five-year period before the contract expires, the protection seller must pay the investor $100 million less the then-current market value of $100 million of obligations issued or guaranteed by Company X (or must buy bonds of Company X from the investor at par). To receive this protection, the investor must pay the protection seller periodic payments over the five-year term of the contract and possibly an additional upfront amount.

52.     A market participant might also purchase an index CDS for hedging purposes. For example, an investor can purchase an index CDS to hedge a portfolio of bonds. A CDS index may be a more cost-efficient way to hedge a broad portfolio than buying individual CDS for each bond.

53.     A protection buyer may also enter into a "naked swap" CDS contract, where the investor does not own the underlying referenced security on which the contract is based. "Naked swaps have proliferated over the years, comprising over 80% of the CDS market," according to an estimate by Eric Dinallo, the former superintendent of the New York State Insurance Department. For example, a supplier that is reliant on one major manufacturer as its primary customer might seek to protect itself against the risk that the manufacturer will fall into bankruptcy. The supplier could purchase a CDS to hedge against the risk that this major customer might go out of business without owning any debt securities issued by the manufacturer.

54.     After a buy side participant enters into a CDS transaction with a dealer, the dealer usually enters into an off-setting CDS transaction for the same reference entity and notional

amount with another sell side participant. In this off-setting transaction, the dealer is the buyer and another dealer is the seller. The offsetting process often repeats itself several times such that an initial CDS contract can lead to multiple offsetting CDS contracts. According to a Federal Reserve Bank of New York report, over 60% of all CDS transactions are interdealer. Thus, Dealer Defendants systematically engaged in innumerable interdealer transactions in which they essentially passed CDS contracts between themselves multiple times. In doing so, Dealer Defendants provided to one another real-time price data on CDS – data which was unavailable to buy side market participants.

55. Defendant ISDA is a financial trade association in the OTC derivatives market. Dealer Defendants control ISDA through seats on its board of directors, which is chaired by Stephen O'Connor, who until June 6, 2013 was a managing director of Morgan Stanley. ISDA's board also includes executives from Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, and JPMorgan.

56. CDS contracts are standardized under "ISDA Master Agreements" and CDS product-specific forms and definitions.

57. ISDA maintains the industry standard OTC derivative contract. In 1992, ISDA developed the ISDA Master Agreement, under which parties could enter into swaps and any other form of OTC derivative transaction. An ISDA Master Agreement is an agreement that documents the overall relationship between two parties that wish to enter into derivative transactions from time to time. The ISDA Master Agreement is designed to be used to document any category of OTC derivative transaction, including CDS. ISDA Master Agreements are used in more than 90% of bilateral derivatives transactions globally.

58. The ISDA Master Agreement constitutes a framework of standardized terms. The first part of the agreement is a pre-printed form; amendments and elections are set out in the Schedule to the Master Agreement. Confirmations set out the particular terms of individual transactions entered into under the Master Agreement. In 2002, the ISDA Master Agreement was revised to specifically address CDS contracts. This document was entitled "Master Confirmation Agreement on Credit Default Swaps."

59. Under standard ISDA documentation for CDS, the credit events that can trigger the protection seller's payment obligation on a CDS include an issuer's bankruptcy, the acceleration of payments on its obligations, default on its obligations, the failure to pay its obligations, the restructuring of the issuer's debt, or a repudiation or moratorium on payments on its obligations.

60. The determination of whether a credit event occurs involves consideration of the performance of the reference entity under the CDS. In 2009, ISDA developed a new Master Confirmation Agreement (the so-called "Big Bang Protocol"), which established "Determinations Committees." These committees vote on whether a credit event has taken place. For a protection buyer to claim payment under a CDS, the regional Determinations Committee must agree that a credit event has occurred. A Determinations Committee was formed for each of the following regions: the Americas, Asia (excluding Japan), Australia-New Zealand, Europe, and Japan. A Determinations Committee has 15 voting members, including eight global dealers. For example, for the Americas region, the voting members include Bank of America/Merrill Lynch, Barclays, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS. BNP Paribas and HSBC are non-voting members of the Determinations Committee for the Americas. The Big Bang Protocol

also introduced auction settlement protocols, created "look back" provisions instituting a common standard effective date, and standardized CDS coupons.

61.     Once a credit event determination occurs, the protection buyer must satisfy certain conditions to trigger the swap, such as providing the protection seller notice.  Once those conditions are satisfied, settlement of payment from the protection seller may be through cash settlement (of the difference between the par value and the market price of debt obligation of the reference entity) or physical settlement, depending on how settlement was specified in the contract.  Where the parties physically settle a CDS, the protection seller pays the protection buyer par value and in return takes delivery of the debt obligation of the reference entity.  In a cash settlement, the protection buyer does not deliver any obligations to the protection seller, and payment to the protection buyer can be assessed as the difference between the nominal and the market value of the reference obligation.

62.     The size of the cash settlement payment is determined in a credit event auction designed by ISDA and administered by Markit and another entity.

**B.      Relevant Market**

63.     The anticompetitive effects alleged in this Complaint occurred in the market for the purchase and sale of CDS contracts in the United States ("CDS market").

64.     CDS have been in existence since the early 1990s when banks, including Dealer Defendants, sought to hedge credit risk in their loan portfolios.  The Commodity Futures Modernization Act of 2000 ("CFMA") allowed investors to enter into CDS contracts without owning the underlying reference entity.  CFMA also greatly increased trading in CDS.  The rapid rise in CDS volume following their inception and the enactment of CFMA demonstrates that investors turned to CDS to secure the unique and critical function of credit protection.  In 1997, the global CDS market was estimated at approximately $180 billion; by the end of 2007, the

CDS market had a notional value of $62.3 trillion. By late-2008/early-2009, as a result of the recession of 2008, among other things, the notional amount outstanding had fallen to $28 trillion.

## C.     Market Power

65.     Dealer Defendants exerted considerable market power in the CDS market during the Class Period. According to a 2011 staff report by the Federal Reserve Bank of New York, Dealer Defendants comprise over 70% of CDS buy-side transactions and over 80% of CDS sell-side transactions.   The Bank for International Settlements reported even higher figures, stating that the Dealer Defendants control over 90 percent of the CDS transaction market.

66.     Their control over Defendants ISDA and Markit, as well as Co-Conspirator ICE and DTCC, enabled Dealer Defendants to preserve their CDS market dominance. The following chart demonstrates the Dealer Defendants' control of Markit, ISDA, ICE and DTCC:

| Defendant | Markit Board of Directors | Markit Shareholder | ISDA Board of Directors | ICE Risk Committee Member | ICE Clear Member | DTCC Board of Directors |
|---|---|---|---|---|---|---|
| Bank of America | X | X | X | X | X | X |
| Barclays | | X | X | X | X | |
| BNP | | X | X | | X | |
| Citibank/ Citigroup | | X | X | X | X | X |
| Credit Suisse | | X | X | X | X | |
| Deutsche Bank | | X | X | X | X | X |
| Goldman Sachs | X | X | X | X | X | X |
| HSBC | X | X | X | | X | |
| JPMorgan | X | X | X | X | X | X |
| Morgan Stanley | X | X | X | X | X | X |
| RBS | | X | | | X | |
| UBS | | X | | X | X | |

67.     Dealer Defendants, collectively and by and through their control of ISDA, Markit, DTCC and ICE, had the power to exclude competition in the CDS market and to widen bid-ask spreads to supra-competitive levels.

68.     Dealer Defendants collective market power is evidenced by their ability to charge supra-competitive bid-ask spreads in the CDS market, deny CDS buyers access to timely, complete and accurate CDS price data, dictate the terms on which CDS are transacted, delay the entry of a competing central clearing house for CDS transactions, and block the entry of an exchange for CDS trading.

**D.    Defendants Restrained Competition In The CDS Market**

**1.     Defendants Conspired to Restrict Access to CDS Pricing Data**

69.     CDS do not trade on exchanges but, rather, are bilaterally negotiated agreements traded OTC.  In an OTC bilateral trading system, counterparties engage directly, transacting with one another without the public disclosures involved in trading on a formal trading platform such as an exchange.  When a protection buyer wants to purchase a CDS, an order is placed with a dealer at a bank.

70.     In bilateral CDS trading, a CDS dealer, such as Dealer Defendants, delivers via Bloomberg "runs" for various CDS types to buy side market participants with which it has trading relationships.  Runs are messages that set out prices at which a dealer would consider buying or selling credit production on particular CDS   They are effectively invitations to negotiate, and are not binding, but are the first step in the process by which CDS contracts are transacted.

71.     In order to enter into CDS transactions, a buy side class member must get a quote directly from a Dealer Defendant.  This request for a quote is carried out through Bloomberg message, email, or telephone call.  When the parties reach agreement on price and size, they have

an orally executed transaction. This oral commitment is subsequently confirmed through an email or other type of writing. The final agreement is subject to the ISDA Master Agreement between the buy side participant and the dealer.

72. In the OTC bilateral trading system, Dealer Defendants participate in virtually all CDS trades. As a practical matter, in a bilateral market requiring bilateral credit relationships to trade, a sell side bank, *i.e.*, a CDS dealer, such as Dealer Defendants, acts as a counterparty on every CDS transaction. This is because bilateral derivatives trading leaves each party in a longer term relationship of counterparty performance risk. In such circumstances, buy side firms are constrained to transact only with dealers that are perceived to be sound long term credit risk, while dealers utilize the ISDA Master Agreement to provide for one-sided posting of collateral by buy side customers to secure the customer's counterparty performance risk. Only dealers can support the extensive legal and collateral management infrastructure to manage these requirements with a wide range of counterparties, whereas the buy side can only manage to trade with a limited number of dealers and could not, in any event, perform credit assessments on other buy side counterparties. Although the ISDA does not explicitly require every trade to have a dealer as a counterparty, the complexity of negotiating the credit arrangement underlying the ISDA Master Agreement essentially forces this arrangement.

73. Because, as a practical matter in the OTC bilateral trading system, a CDS dealer is required to be on one side of every CDS trade, there is no way for buy side participants to transact directly; they each must trade with a CDS dealer. Therefore, the OTC bilateral trading system favors Dealer Defendants by insuring that Dealer Defendants get the opportunity to intermediate and benefit from the spread in every trade.

74.     The flow of market information relating to CDS is overwhelmingly controlled by Defendants.  Dealer Defendants prevented actual, real-time trade data from being released to buy side market participants.  Accordingly, during the Class Period, there was no pre-trade and virtually no post-trade price transparency in the CDS market.  By concealing the actual, real-time market prices for CDS, the ability of Dealer Defendants to maintain wide bid-ask spreads on CDS transactions was greatly enhanced.

75.     There is no pre-trade price transparency in the CDS market for CDS buyers.  Due to Defendants' unlawful conduct, there is no exchange available to a CDS buyer which could provide real-time, continuous streams of bids and offers for a particular CDS.  Rather, CDS buyers looking to transact in a CDS must rely entirely on the Dealer Defendants to provide bids and offers for particular CDS.

76.     Even though Dealer Defendants send out "runs" to their customers, the actual price any Dealer Defendant will transact in a CDS is subject to bilateral, non-public negotiations between a Dealer Defendant and its customer.

77.     Further, Dealer Defendants are free to change the price of a CDS until the moment the trade is mutually closed.  As a result, CDS buyers are totally dependent on Dealer Defendants with respect to pre-trade CDS pricing and have no idea what price another market participant would be willing to transact.

78.     Just as there is no pre-trade price transparency in the form of actual, real-time CDS trade data made available to buy side participants, they are left in the dark regarding post-trade pricing in the CDS market as well.  The scarce post-trade price information that is available to CDS buyers is both stale and not reflective of actual CDS transaction prices.

79.     The most likely source of post-trade CDS price data to CDS buyers is from Defendant Markit.  Markit regularly collects CDS pricing transaction data from market makers, including Dealer Defendants.  At Dealer Defendants' direction, this actual transaction data is not made available to CDS buy side market participants.  Markit makes this clear on its website, where it states that the CDS valuation information it provides "is not transaction data and does not reflect any specific trading activity."

80.     Defendant Dealers have significant ownership interest in Markit.  In fact, Markit is owned, in part, by 16 shareholder banks, including Dealer Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS.  According to 2009 filings at U.K. Companies House, Dealer Defendants Bank of America (including its subsidiary, Merrill Lynch), Goldman Sachs, JPMorgan, and Royal Bank of Scotland collectively owned 39% of Markit.

81.     Rather than providing CDS market participants with actual transaction data it collects from Dealer Defendants at the end of each day, Markit cleanses and aggregates the data and then reports an average price for those transactions.  In some instances, the information reported by Markit includes dealer "marks," *i.e.*, an estimated (not actual) price a market maker deems a CDS to be worth for purposes of marking its own book.  This data does not provide a real-time picture of market prices since it is not based on actual transactions and is always delivered at a lag to actual market transactions.  Thus, Markit's price information is not indicative of the latest market values of CDS contracts.

82.     There is no legitimate business reason why Markit would not make full, real-time data available, for instance, on a paid subscription basis.

83.     Dealer Defendants, on the other hand, have direct access to actual CDS transaction data from interdealer trades.  This data is not made available to buy side participants.  As described above, after a buy side participant enters into a CDS transaction with a dealer, the dealer usually enters into several off-setting CDS transactions for the same reference entity and notional amount with other dealers.  Thus, dealers have knowledge of the true market value for any given CDS.

84.     Outside of the interdealer market, Dealer Defendants also have direct access to actual trade information through the provision of clearing services, as described more fully below.  To handle margin requirements of clearing CDS, Dealer Defendants must obtain actual transaction data.

85.     During the Class Period, most CDS buyers had little, if any, other price information besides the aggregated, processed, and delayed information that Defendant Markit made publicly available.  Accordingly, buy side participants could not discover actual prices paid or bid by other participants in the market.  This information was available exclusively to Dealer Defendants and the institutions they controlled.

86.     Dealer Defendants also prevented DTCC from publishing CDS price data to the market.  DTCC, through its subsidiaries, Deriv/SERV LLC and the Warehouse Trust Company LLC, provides post-trade processing services for CDS transactions, such as posting, matching, and confirmation.  DTCC offers the market's "first and only centralized global repository for trade reporting and post-trade processing of OTC credit derivatives contracts."  Through these services, DTCC collects CDS price data and trading volume data from Dealer Defendants.

87.     Dealer Defendants exert control over DTCC through positions on its board of directors and control of its key operating committees.  DTCC board members include executives

from Bank of America, Citigroup, Deutsche Bank, Goldman Sachs, JPMorgan, and Morgan Stanley.

88. At Dealer Defendants' direction, DTCC only provides aggregated CDS price data and trading volume data, which it updates weekly. It does not provide the underlying transaction data to the public.

89. Moreover, in addition to the Dealer Defendants' presence on the board of DTCC, there is another factor compromising DTCC's willingness to provide information it collects more broadly: DTCC's 50:50 joint venture with Markit, called MarkitSERV, which it entered into in September 2009. MarkitSERV, according to its website, "combines the flagship electronic trade confirmation, position reconciliation and related workflow patterns from its parent companies to provide a single gateway for over-the-counter (OTC) derivative transaction processing globally." However, according to Robert E. Litan, former Deputy Assistant Attorney General at the DOJ's Antitrust Division who helped oversee the DOJ's NASDAQ investigation, "[g]iven this arrangement [with Markit], any effort by DTCC to make its data widely available to other data vendors or service providers would run counter to Markit's economic interests."

90. The lack of real-time price information in the CDS market to buy side market participants benefitted Dealer Defendants, allowing them to profit from inflated bid-ask spreads. Dealer Defendants profit by retaining the price difference – *i.e.*, the bid-ask spread – between the protection buyer and the protection seller in the CDS. Because there is no price transparency available to CDS buyers, the amount of the bid-ask spread retained by Dealer Defendants is unknown to the CDS buyer. Indeed, as one CDS trader told Reuters, "[i]f you are one of the top 10 investment banks, you will know what C.D.S. pricing and trading patterns are."

91.     This is in stark contrast to the securities and futures markets, where, on a central exchange like the New York Stock Exchange or NASDAQ, market participants can, in real time, see the price of the last transaction traded on the exchanges, as well as current, binding (executable) bids and offers.

92.     The dominance Dealer Defendants have in controlling and manipulating the information that is available to CDS buyers allows them to reap massive profits.  Dealer Defendants collect billions of dollars annually from supra-competitive CDS bid-ask spreads.  For example, *Bloomberg* reported on February 28, 2012, that Defendant JPMorgan alone generates $375 million from credit trading in a typical quarter.

## 2.     Defendants Conspired to Block Entry of A Competing Clearing House and a CDS Exchange

93.     In 2008, several large buy side market participants and other entities proposed to remedy the inefficiencies and pricing opacity in the CDS market by developing central clearing houses and exchanges to replace the OTC bilateral trading system.

94.     As previously discussed, in the OTC bilateral trading system, buy side market participants (whether buying or selling CDS contracts) will only enter into CDS transactions with a counterparty that has sufficient financial resources to provide credit protection, that is, from a seller that can be depended on to make the payment triggered by a credit event.  In the OTC bilateral trading system, the only way for buy side participants to assure themselves that sellers have sufficient financial resources is to engage in transactions with major financial institutions, such as Dealer Defendants, whose resources are known to be very large.

95.     In CDS transactions, the clearing house serves an important function as buyer to every protection seller and as seller to every protection buyer, reducing the risk of counterparty default and increasing market stability.  A clearing house, holding precisely offsetting

obligations, makes each payment required to each party and supports its ability to meet those payments by requiring collateral from both parties to the trade and by maintaining default management procedures in the mutualization fund to enable it to perform if one party defaults. By interposing itself between participants and assuming counterparty credit risk, a clearing house enables market participants to accept the best bids and offers without concern that a counterparty may default.

96.     If, in fact, clearing is available, exchange trading becomes possible (if the clearing offering is suitably structured).  Although CDS are now traded OTC, CDS could be exchange-traded like securities and futures.  Financial products with high trade volume that are relatively standard, for example, certain liquid OTC derivatives such as CDS indexes, are natural candidates for exchange-based trading.

97.     In October 2008, the New York Federal Reserve hosted a meeting with CDS market participants, including Dealer Defendants and buy side participants, to discuss establishing central counterparty clearing in the CDS market.  The New York Federal Reserve was in favor of bringing central counterparty clearing to the CDS market because it would increase the amount and quality of market information available to market participants, regulators, and the public.

98.     In addition, central counterparty clearing for CDS would reduce the systemic risk associated with counterparty credit exposures, illustrated by the collapse of Lehman Brothers and the bailout of AIG.  CME Chief Executive Craig Donohue echoed the existing uncertainty within the CDS market, stating in an interview with Reuters that "[t]his (CDS) market is not functioning well right now, and the risk issues are significant.  Everybody is afraid to trade with everybody

because they don't know who will be left standing . . . ." However, he stated that "a central counterparty system is going to help dramatically improve confidence."

99.     Four potential CDS central counterparties presented clearing proposals at the meeting: Citadel/CME, IntercontinentalExchange, Eurex, and NYSE Euronext.

100.     In September 2008, prominent buy side participant Citadel, LLC ("Citadel"), working together with CME Group Inc. ("CME"), which describes itself as "the world's leading and most diverse derivatives marketplace," entered into a joint venture company, called CMDX, to launch the first fully integrated electronic trading platform and central counterparty clearing facility. Counterparty clearing for CMDX exchange-traded CDS was processed through CME Clearing, the world's largest derivatives clearing facility. Exchange membership in CMDX was to be open to dealers, banks, and institutional investors. Each exchange member could either be self-clearing or could clear through a clearing house participant. Clearing house membership was to be open to dealers and well-capitalized non-dealers. Citadel and CME spent millions of dollars to develop, build, and test CMDX, such that central clearing and exchange trading through the CMDX venture was feasible as early as the first quarter of 2009. The goal was to set up a clearing house as well as an electronic trading exchange which would open pricing for CDS by quoting their prices electronically.

101.     The CMDX exchange and clearing platforms offered numerous advantages over the existing OTC bilateral trading system. These benefits included greater market efficiency and more robust risk management through price transparency and the ability to monitor large positions and risk exposures. Exchange trading would also enhance liquidity through broad-based participation in the exchange. Fungible standardized contracts and anonymous execution on an electronic exchange would improve liquidity and efficiency.

102.    In an exchange environment, rather than an OTC bilateral trading system, Dealer Defendants would lose their grasp on two important controls leading to compression of bid-ask spreads.  First, they would no longer be participants in every transaction.  Second, exchange trading matching anonymous buyers and sellers on the basis of publicly available information would make customers more effective competitors to dealers and would drive volume.  As competition and volume increase, and pricing becomes transparent, spreads compress.

103.    Dealer Defendants were aware of the consequences of losing control of the infrastructure in a particular financial market.  In other markets, such as the market for equity options, the creation of an exchange similar to CMDX compressed spreads.  The market for equity options once featured wide bid-ask spreads similar to those Dealer Defendants maintain in CDS.  The advent of exchange trading in the equity options market enabled new entrants and all-to-all trading and dramatically reduced those spreads, while increasing the volume of equity options traded.  The effect on the CDS market of an exchange would have been similar, but for Defendants' successful efforts to reject CMDX's exchange platform.

104.    Central clearing and exchange trading threatened to end the OTC bilateral trading system Dealer Defendants created and maintained for their own advantage.  The CMDX exchange platform would have allowed buyers to make anonymous public bids and sellers to make anonymous public offers, with a computer system matching bids and offers, thus sidestepping the necessity of involving Dealer Defendants as participants in every transaction.  Thus, CMDX would have enabled market participants to interact directly with each other and to bypass Dealer Defendants, a phenomenon also known as disintermediation because it removes Dealer Defendants from the equation and allows for a more efficient market with increased trading volume and compressed bid-ask spreads.

105.    CMDX got the final regulatory approval by the SEC on March 13, 2009, for CDS clearing and exchange trading.  However, as detailed herein, OTC dealing of CDS remains the structure today only because of the unlawful conduct engaged in by Defendants.

### (a)    Defendants Conspired to Block Entry of A CDS Exchange

106.    Although Dealer Defendants reigned supreme over the CDS market, challengers to their domination emerged.  As noted above, joint venture CMDX was launched in 2008 for the purpose of creating a transparent CDS marketplace for CDS buyers, providing both pre-trade price transparency (*e.g.*, a real-time, continuous stream of bids and offers for a CDS) as well as post-trade price transparency (*e.g.*, virtually instantaneous reporting of actual price/volume trade information).

107.    CMDX was a genuine threat to the status quo created by the Dealer Defendants because of the pricing transparency CMDX sought to deliver to the CDS market.  With price transparency, CDS buyers could see what Dealer Defendants were offering to other buy side market participants.  Transactional visibility to CDS buyers would force Dealer Defendants to compete on offers they made to such market participants.  There would cease to be the informational asymmetry off of which the Dealer Defendants profited greatly.

108.    Indeed, the threat posed by exchange-based trading was exemplified by the statements made by Blackrock's Lawrence Fink in an interview with *Bloomberg News*.  He stated that "[w]e need to find ways to bring down that trading friction cost, we need to make sure we're not being taken advantage of.  Hopefully, our counterparties, our dealers, will make less money from us and our clients are going to make more return."  Dealer Defendants were under no misapprehension as to how exchange-based trading would affect them.

109.    As result of this threat of a competitive marketplace, Dealer Defendants jointly agreed to prevent the development of CMDX's electronic exchange.  Without the Dealer

Defendants' support, CMDX's electronic exchange had no chance of success. Indeed, one analyst from Equity Research Desk, a Connecticut-based advisory firm specializing in exchanges, stated "how difficult it is for an exchange to shift OTC business without dealers support."

110.    Prior to CMDX's formation, Citadel and CME held a series of meetings with key players in the CDS market whose cooperation they would need in order for CMDX to succeed. CMDX recognized that the Dealer Defendants' participation would be essential because the Dealer Defendants controlled the CDS market, including Markit and ISDA.

111.    Recognizing the need for Markit's data in order to be a viable CDS exchange, CMDX started licensing negotiations with Markit in October 2008 relating to its CDS indices and its proprietary Reference Entity Database ("RED") identifier system, "the market standard that confirms the legal relationship between the reference entities that trade in the CDS market and their associated reference obligations." Markit had an economic interest in pursuing these negotiations and encouraging the launch of CMDX because Markit stood to gain revenues from licenses. For example, CMDX planned to launch with all major CDX and iTraxx indices, which Markit owned, as well as Markit's nearly 3000 single-name constituents, covering most of the CDS market. The ability to offer exchange trading of the CDX and iTraxx indices was important because index CDS constituted approximately 50% of the market. In addition, a functioning exchange would have necessarily created transaction data. Markit was the recipient of dealer transaction data in the OTC bilateral trading system. If an exchange had been set up, Markit was in a position to potentially sell the exchange's transaction data.

112.    Given these powerful economic incentives, Markit should have leaped at the opportunity to participate in the creation of the exchange and license its transaction data to

CMDX. Had Markit been an independent firm, it might well have licensed this information. However, Markit was not independent – it was controlled largely by the Dealer Defendants, all of which were shareholders and many of which sat on Markit's board of directors. None of the Defendants wanted to share the information necessary to ensure competition in a marketplace over which they had a stranglehold, ensuring them profitable supra-competitive bid-ask spreads.

113.    Similarly, it was also in ISDA's unilateral self-interest to participate in the creation of a CDS exchange. Use of certain of ISDA's Master Agreement terms that had become industry standard and access to ISDA credit auction protocols were also crucial to operating CMDX. A licensing agreement with CMDX for the use of the ISDA Master Agreement would allow exchange-traded CDS to mirror market conventions and practices, including the incorporation of ISDA Credit Derivatives definitions, adherence to decisions of the ISDA Determinations Committee, and settlement to the ISDA auction settlement price. ISDA stood to gain valuable licensing revenues from the increased volume of transactions and market participants that exchange trading would beget.

114.    A fully independent entity with ISDA's intellectual property would have every incentive to entering into a licensing agreement with a potential customer. However, like Markit, the leadership of ISDA is dominated by Dealer Defendants who control ISDA through seats on its board of directors.

115.    Thus, instead of embracing exchange trading, Dealer Defendants agreed to deny CMDX the licenses from Markit and ISDA that were needed to operate an effective exchange. In order to maintain the control of the OTC bilateral trading system, Defendants railroaded the effort to effectuate exchange trading through CMDX.

116.    To coordinate their efforts to block entry of a CDS exchange, Dealer Defendants regularly communicated with each other through their overlapping memberships in Markit, ISDA, ICE and DTCC.  Because the boards of directors for each of these institutions are essentially identical—in that they are dominated by Dealer Defendants—there were many opportunities for representatives of Dealer Defendants to meet and discuss how they would implement this conspiracy, as these boards regularly held private meetings.

117.    Although CMDX eventually obtained licenses from Markit and ISDA around April 2009, the licenses were for the clearing platform only, not the exchange platform.  Markit and ISDA conditioned their grant of licenses on the following terms:  (1) *that CMDX drop its plans for an electronic CDS exchange*; (2) that CME Group end its joint venture partnership with Citadel; and (3) that CMDX adhere to onerous restrictions on the their clearinghouse activities.

118.    Dealer Defendants exerted considerable pressure on CME concerning its joint venture with Citadel to create a CDS exchange.  So opposed were Dealer Defendants to this joint venture, that they held CME's planned CDS clearing platform hostage by conditioning their membership in CME Clearing with CME's abandonment of its CMDX venture with Citadel.  Dealer Defendants' membership was essential for CME Clearing because of their dominance in the CDS market.  Without them, CME Clearing could not effectively compete with ICE Clear Credit.

119.    As a result, CME cracked under Dealer Defendants' pressure and in mid-2009, CME announced it was backing out of its plans to create an electronic CDS exchange with Citadel.  With Citadel out of the picture, the Dealer Defendants agreed to join CME Clearing.

120.    The same type of anticompetitive conduct undertaken by Defendants was the subject of DOJ correspondence submitted to both the CFTC and SEC in response to those

agencies' proposed rulemakings on ownership limits and governance restriction for exchange and clearing platforms. Concerned about the dominance major dealers could have over the development of competitive exchanges, DOJ wrote:

> [L]imiting aggregate ownership and imposing stringent governance requirements . . . may prevent the emergence of a dominant trading platform controlled by major dealers to the detriment of other market participants. The creation of such a platform would be roughly analogous to the three or five largest airlines controlling all landing rights at every U.S. airport—the big carriers could use this control to disadvantage smaller carriers by restricting landing rights or raising their rivals' costs to access the airports.

121. More significantly, DOJ warned that major dealers would use their dominance "to continue trading over the counter even in instances where exchange trading is feasible." DOJ further cautioned that this issue "might arise even though the CFTC has considerable authority to mandate central clearing of contracts."

122. Dealer Defendants ultimately used their dominance in the CDS market and their control of Markit, DTCC, ICE and ISDA to arrest the development of exchange-based trading of CDS contracts, even though—as DOJ stated—such "trading is feasible."

123. Because Defendants viewed a CDS exchange as disruptive to the current dealer business model, they conspired to squelch the development and introduction of a CDS exchange. And they succeeded. OTC bilateral trading of CDS has remained only because of the anticompetitive conduct of Defendants.

### (b) Defendants Conspired to Block Entry of A Competing Central Clearing House

124. Dealer Defendants also viewed a buy side-supported clearing platform as a threat to maintaining the OTC bilateral trading system, and thus proceeded to undermine CMDX's clearing platform in favor of a clearinghouse developed and controlled by the sell side.

125.    Although they had already prevented CMDX from entering the market as an exchange-based competitor, Dealer Defendants also sought to ensure that CME would fail to gain any foothold in clearing CDS.  Dealer Defendants feared that even a considerably hamstrung CME clearinghouse, if allowed even the slightest window of opportunity to function as an alternative clearinghouse, could be used as a springboard for unbiased clearing and exchange trading.  That was simply an unacceptable challenge to Defendants' carefully orchestrated scheme.  Thus, they conspired to ensure that ICE became the dominant clearing house because they could control it.  This consisted of a two-part attack by Defendants.

126.    First, they intentionally delayed licensing negotiations between CME Clearing, Markit and ISDA.  While Dealer Defendants, through their control of Markit and ISDA, stalled in the licensing negotiations with CME, they rushed to launch their own Dealer Defendant-controlled clearing house with ICE.  Dealer Defendants succeeded, and as a result were able to obtain pivotal first-mover advantage for the ICE clearinghouse they controlled.

127.    The second means by which the Dealer Defendants handicapped CME Clearing was to remove any independent influence CME Clearing might exert on the CDS market.  Dealer Defendants became members of CME Clearing so they could exert a measure of control over it and limit the entities that could join it.  Dealer Defendants also channeled nearly all of the CDS they cleared through ICE.  Together, these actions had the effect of minimizing CME's influence in the CDS market and its viability as a competing clearing house to Defendant-controlled ICE.

128.    CDS buyers went on the record to voice their concern that Dealer Defendants had no intention of providing a competitive clearing solution to ICE or supporting a CDS electronic exchange.  In June 2009, BlueMountain Capital Management's COO Samuel Cole, a large buy-side member of the CME's CDS platform, wrote in an email following a May 29, 2009

conference call of ISDA's credit steering committee and the buy-side clearing working group, that "[t]he dealers suggested more than once that there is room for only one solution in the market." He further wrote that "Dealers are deriving substantially more economic value from their relationship with ICE than the six buy-side firms are from their relationship with CME." And he cautioned that "The stunned silence that you heard from the buy-side firms on Friday's call was the disquieting realization that the dealer community may be filibustering to protect its oligopoly and not seriously engaged in working with the buy side to develop a clearing solution." Finally, he "urge[d] the dealers to change course and work with us to build a viable clearing solution that is in the interest of the entire market."

129.   Dealer Defendants ultimately asserted complete control over the clearing of CDS transactions through ICE.  Under the clearing rules established by ICE's Risk Committee, ICE accepts trades only from participants, which primarily include Dealer Defendants.  ICE has no buy side clearing members.

130.   ICE clearing members – primarily Dealer Defendants – are afforded preferential fee treatment and also enjoy a revenue sharing arrangement with ICE, which provides them with an incentive to patronize ICE.   Indeed, ICE's development as the preferred clearing entity for the Dealer Defendants' CDS transactions started with ICE's acquisition of The Clearing Corporation ("TCC"), another entity primarily owned by the Dealer Defendants, including Goldman Sachs, Bank of America, JPMorgan, and Citigroup.  TCC provides ICE with risk management, operational processing and clearing systems for ICE's credit swap clearing. Pursuant to contractual arrangements entered into at the time of TCC's acquisition by ICE, former TCC shareholders (and Dealer Defendants) receive 50% of the profits generated by ICE.

Thus, Dealer Defendants – who are shareholders of both ICE and TCC – have a direct and powerful financial incentive to direct clearing of CDS trades through ICE only.

131.     Dealer Defendants control ICE's membership and rules through seats on ICE's Risk Committee.  The rules require that Dealer Defendants together hold at least nine seats on the twelve-member ICE Credit Risk Committee, which is the panel that writes the ICE's rules and determines its membership requirements.  In fact, the rules expressly provide which institutions—many of which are Dealer Defendants—must be represented on the Risk Committee: "[t]he nine Participant Appointees will include one member appointed by each Participant Group that includes or is Affiliated with on of the following:  Bank of America, N.A.; Barclays Bank PLC; Citibank, N.A.; Credit Suisse Securities (USA) LLC; Deutsche Bank AG; Goldman Sachs International; JPMorgan Chase Bank, N.A.; Morgan Stanley Capital Services, Inc.; and UBS AG."

132.     The ICE Risk Committee has been publicly described as the "Derivatives Dealers Club."  Robert E. Litan, former Deputy Assistant Attorney General at the DOJ's Antitrust Division, stated that:

> The private actors who now control the trading of derivatives and all key elements of the infrastructure of derivatives trading [are] the major dealer banks.  The importance of this 'Derivative Dealers' Club' cannot be overstated.  All end-users who want derivatives products, CDS in particular, must transact with dealer banks.  The dealer banks, in turn, transact heavily with each other, to hedge the risk from their customer trades and somewhat less frequently, to trade for their own accounts.

133.     He also warned that the limited number of players in the CDS clearing market invites opportunities for collusion.  In an interview with the *New York Times*, he stated "[w]hen you limit participation in the governance of an entity to a few like-minded institutions or

individuals who have an interest in keeping competitors out, you have the potential for bad things to happen. It's antitrust 101."

134.     In the case of ICE, Dealer Defendants, as members of that clearing house, required that ICE establish a clearing house rulebook written in the Dealer Defendants' favor. As a general matter, to join a clearing house, clearing members must meet the clearing house's requirements (*e.g.*, capitalization, credit worthiness, and operational readiness) and must be prepared to post a minimum deposit into the clearing house's guaranty fund. For each transaction that is cleared, participants must post initial margin for the transaction to cover fluctuations in the prices of positions held by individual participants. Also, if a participant to a transaction is not a member of a clearing house, it must engage the services of an entity that is a member of the clearing house to use a clearing service.

135.     ICE's Risk Committee determined the amount of the capital that a member must have to join the clearing house. Initially, ICE required members to have an excessively large amount of "Tangible Net Equity" – $5 billion in derivatives units – to join ICE. This had the effect of excluding buy-side participation in the clearing house as the amount was prohibitively high.

136.     Thus, even major financial institutions, such as Bank of New York Mellon, were kept out of the "Club" because they were unable to meet ICE's membership requirement. Bank of New York Mellon applied to become an ICE clearinghouse member in 2010. ICE rejected the application because Bank of New York Mellon's derivatives operations could not meet the onerous capital threshold set by ICE.

137.     Reacting over the rejection, Sanjay Kannambadi, chief executive of Bank of New York Mellon Clearing, said "[w]e are not a nobody. But we didn't qualify. We certainly think

that's kind of crazy."  In an interview with the *New York Times*, Mr. Kannambadi bluntly stated that the real reason Bank of New York Mellon was being shut out was that rivals wanted to preserve their profit margins, and were doing so through the drafting of membership rules.

138.    State Street Corporation and smaller brokerage firms like MF Global and Newedge were similarly rejected by ICE.  Marcus Katz, a senior vice president at Newedge, stated that ICE's criteria seemed arbitrary: "[i]t appears that the membership criteria were set so that a certain group of market participants could meet that, and everyone else would have to jump through hoops."

139.    Darrell Duffie, a professor at the Graduate School of Business at Stanford University, stated that "[t]he revenues these dealers make on derivatives is very large and so the incentive they have to protect those revenues is extremely large."  He also noted that it "will be hard for the dealers to keep their market share if everybody who can prove their creditworthiness is allowed into the clearinghouses.  So they are making arguments that others shouldn't be allowed in."  Without access to the clearing house, other institutions could not develop meaningful CDS derivative operations, which is the result Dealer Defendants intended through ICE's restrictive membership rules.

140.    Eventually, under pressure from the CFTC, ICE reduced its net capital requirement from $5 billion to $100 million in July 2011.  However, at the same time, ICE required that certain entities hold 5% of customer funds as excess net capital.  The 5% margin requirement continued to effectively prevent smaller entities from entering the CDS clearing business.  Then, in October 2011, the CFTC finalized a rule lowering the capital membership requirement for firms to become clearing members even further to $50 million.

141.    The October 2011 reduction was in part triggered by DOJ's formal submission of comments during the CFTC's rulemaking process.  DOJ expressed concerns that a clearing house's "captured committees could serve as a mechanism for attempts to further restrict competition among dealers and other market participants."  DOJ also addressed the fact that major market makers, like Dealer Defendants, which control a clearing house's operations "could result in their restricting access to new clearing members in an effort to insulate themselves from competition in making markets . . . ."  DOJ further voiced concerns that incumbent clearing house members could "explain away" restrictions against potential new clearing members by proffering specious justifications, such as "risk management-related concerns."

142.    These concerns echoed those expressed by DOJ in 2010 regarding ownership of clearing houses to settle derivatives trades.  In correspondence to both the SEC and CFTC, the DOJ expressed concerns that the proposed limits on major derivatives dealers' ownership of clearing houses did not go far enough.  DOJ stated that without "an aggregate ownership cap on major derivatives dealers" the proposed rules "may not sufficiently protect and promote competition in the industry."

143.    DOJ further expressed concern that without ownership restrictions, "access to clearing might be restricted by incumbents to limit competition among market makers, and dealer-controlled DCO [derivative clearing organization] might resist clearing certain instruments in an effort to disadvantage rivals."  In critiquing the proposed rules, DOJ found that "major dealers as a group likely share very similar incentives to limit access and to otherwise insulate themselves from competition" and "there is no barrier to a group of entities—major

- 38 -

derivatives dealers, for example—working together to control a [clearing house] to their combined competitive advantage."

144.    Dealer Defendants ultimately exercised their collective domination of both the CDS market and ICE to resist the entry and success of competing clearing houses and dealers.

145.    Indeed, other institutions attempted to form CDS clearing houses but they suffered similar or worse fates as CME Clearing.  Dealer Defendants simply refused to clear the vast majority of their CDS transactions through any clearing house other than ICE.

146.    Defendants' concerted effort in refusing to deal with CME Clearing is borne out in the data.  For example, as of May 2012, CME had cleared CDS contracts with a gross notional value of only $116.9 billion.  Another clearing house, LCH.Clearnet, had cleared only 5,914 CDS trades with a gross notional value of only €210 billion ($273 billion) as of July 2013.  Two other clearing houses operated by Eurex and Euronext Liffe have already shuttered their business, after the former failed to clear even €100 million ($123.5 million) in CDS, and the latter did not manage to clear a single CDS trade.

147.    By comparison, as of June 2013, ICE had cleared $25.2 trillion in CDS by gross notional value, including $1.5 trillion in buy-side clearing and $2.4 trillion in single-name CDS clearing.  As of the same date, ICE Clear Europe (ICE's sister corporation located abroad) had cleared €12.7 trillion of gross notional value, including €1.76 trillion in single-name CDS clearing.

### 3.    Government Regulators Are Investigating Collusion in the CDS Market

148.    The activities of Defendants have not escaped scrutiny from regulatory authorities.  On July 14, 2009, *Bloomberg* reported that the DOJ launched an inquiry into anticompetitive practices in the trading, clearing and pricing of CDS in the United States.  Laura Sweeney, a DOJ spokeswoman, confirmed the investigation, stating that "[t]he antitrust division

is investigating the possibility of anticompetitive practices in the credit derivatives clearing,
trading and information services industries."

149.    DOJ is focusing its investigation on whether dealers that have an equity stake in
Markit have an unfair advantage over other market participants relating to CDS price
information.  It has requested information on the amount of their trading, how much they have at
risk in the market, and the monthly value of their CDS contracts.

150.    Furthermore, DOJ is seeking to find the level of current bank ownership in Markit
and whether the shareholders have tried to sell their stakes.  A graphic from the *Wall Street
Journal* illustrates the nature of DOJ's investigation:



151.    Certain of Dealer Defendants have disclosed the DOJ's investigation and
subpoenas: Citigroup, Deutsche Bank, Goldman Sachs, JPMorgan Chase and Morgan Stanley.
In addition, DOJ has begun interviewing individuals in connection with its investigation.  DOJ
also issued a civil investigative demand ("CID") to DTCC.  DTCC confirmed that it received the
DOJ's CID, which sought information in connection with DOJ's probe into the CDS market.

152.   In commenting on DOJ's investigation, former JPMorgan investment banker William Cohan stated "[t]he fact that they [the Dealer Defendants] control Markit and it provides information about the prices of credit-default swaps and they've benefitted from this for many years without any challenge or investigation was outrageous."

153.   According to a *Bloomberg* article published on May 21, 2012, DOJ reportedly expanded its probe into the CDS market to include information about two other companies: Tradeweb LLC and TCC.  DOJ also sought information about Markit's RED identifier system.

154.   A *Bloomberg Businessweek* article reported that people familiar with the DOJ's investigation stated that the investigation covered Markit's anticompetitive practices ranging from requiring customers to buy bundled services to restricting which trades can be cleared. Those sources said that Markit told a swaps clearing house customer to purchase a pricing service as a condition of granting use of its benchmark indexes.  Those sources also said that Markit conditioned the licensing of its indexes to another clearing house only if every swap cleared included one of its Dealer Defendant owners.

155.   DOJ is not the only regulator whose eye the Defendants' conduct caught.  In April 2011, the EC announced that it was launching "two antitrust investigations concerning the Credit Default Swaps market."  The first investigation "focuses on the financial information necessary for trading CDS.  The Commission has indications that the 16 banks that act as dealers in the CDS market give most of the pricing, indices and other essential daily data only to Markit, the leading financial information company in the market concerned."  The EC suspects that this conduct may have occurred as a result of "collusion between them or an abuse of a possible collective dominance and may have the effect of foreclosing the access to the valuable raw data

by other information service providers." Abuse of dominant market position and collusion violates Articles 101 and 102 of the Treaty on the Functioning of the European Union.

156.     The EC's second investigation concerns a number of agreements between CDS dealers Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley and UBS and ICE Clear Europe.

157.     According to *Bloomberg*, the EC's investigations were sparked by the difficulties faced by Deutsche Boerse AG and CME as they tried to enter the CDS market.

158.     ICE Clear Europe is ICE's derivatives clearing European counterpart and is based in London. According to ICE's CDS Fact Sheet on ICE CDS Clearing, ICE Clear Europe "leverages CDS technology and risk models already developed by ICE and utilized by market participants." All of ICE Clear Europe's 16 clearing members are also clearing house members for ICE. ICE Clear Europe's clearing members include: Bank of America, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Merrill Lynch, RBS, and UBS.

159.     The EC stated that these agreements "contain a number of clauses (preferential fees and profit sharing arrangements) which might create an incentive for the banks to use only ICE as a clearing house. The effects of these agreements could be that other clearing houses have difficulties successfully entering the market and that other CDS players have no real choice where to clear their transactions." The EC is also investigating whether fee structures used by ICE give an unfair advantage to its member banks by discriminating against other CDS dealers.

160.     On March 26, 2013, the EC, after two years of investigation, indicated that it had expanded the scope of the probe to include Defendant ISDA. In a press release, the EC "found preliminary indications that ISDA may have been involved in a coordinated effort of investment

banks to delay or prevent exchanges from entering the credit derivatives business." The EC stated that "[s]uch behaviour, if established would stifle competition in the internal market in breach of EU antitrust rules."

161. On July 1, 2013, the EC "informed some of the world's largest investment banks of its preliminary conclusion that they infringed EU antitrust rules that prohibit anticompetitive agreements by colluding to prevent exchanges from entering the credit derivatives business between 2006 and 2009." The EC sent its statement of objections to Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, UBS, as well as ISDA and Markit, among others.

162. According to the Commission, a "statement of objections is a formal step in Commission investigations into suspected violations of EU antitrust rules. The Commission informs parties concerned in writing of the objections raised against them and the companies can examine the documents in the Commission's investigation file, reply in writing and request an oral hearing to present their comments on the case in front of representatives of the Commission and national competition authorities." Should the EC conclude that there is sufficient evidence of a violation, it can issue a "decision prohibiting the conduct and impose a fine of up to 10% of a company's annual worldwide turnover."

163. In a press release issued by the EC, Commission Vice President in charge of competition policy Joaquin Almunia said "[i]t would be unacceptable if banks collectively blocked exchanges to protect their revenues from the over-the-counter trading of credit derivatives. Over-the-counter trading is not only more expensive for investors than exchange trading, it is also prone to systemic risks."

164.     The EC's press release announcing the issuance of its statement of objections stated that "[b]etween 2006 and 2009, Deutsche Börse and the Chicago Mercantile Exchange tried to enter the credit derivatives business.  The exchanges turned to ISDA and Markit to obtain necessary licenses for data and index benchmarks, but, according to the preliminary findings of the Commission, the banks controlling these bodies instructed them to license only for 'over-the-counter' (OTC) trading purposes and not for exchange trading.  Several of the investment banks also sought to shut out exchanges in others, for example by coordinating the choice of their preferred clearing house."

165.     The EC also released a series of "Frequently Asked Questions" concerning its CDS investigation and statement of objections.  In explaining the harm potentially cause by the alleged conduct of banks to block exchanges from entering the credit derivatives business, the EC stated:

> [E]xchange-trading of credit derivatives could have improved transparency and market stability.  Indeed, unlike trading "over the counter" (OTC), exchange trading is automatically combined with central clearing.  Central clearing eliminates "counterparty risk," that is to say the risk that the contractual partner of a derivatives contract will not honour its obligations towards the other trading partner.  Through various means (collaterisation, guarantee fund) the clearinghouse continues to service the contract even if one of the trading partners later defaults, and thus isolates other market participants from the effect of this default.
>
> Before the 2008 financial crisis, in the absence of central clearing, credit derivatives involved considerable counterparty risks.  Risk management practices to mitigate such risks were inadequate and increased the fragility of large investment banks.  As the example of Lehman Brothers showed, the failure of one large dealer bank only can set off a chain reaction that destabilizes the entire financial market.  This is why after the financial crisis of 2008, the G20 leaders required the introduction of central clearing of OTC derivatives.

166.     The suspected violations of EU antitrust rules articulated by the EC in its statement of objections involve essentially the same conduct by essentially the same entities as the anticompetitive conduct alleged herein.

## MARKET CHARACTERISTICS FACILITATING DEFENDANTS' ANTICOMPETITIVE CONDUCT

167.     The market for CDS is highly concentrated.  There are few participants.  Dealer Defendants are the largest CDS dealers in the world.  During the Class Period, Bank of America, Barclays, BNP Paribas, Citibank, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, HSBC, Morgan Stanley, Royal Bank of Scotland, and UBS accounted for over 90% of CDS dealing by notional amount.

168.     The vast majority of CDS contracts are homogenous, commodity-like products with standard terms.  Indeed, Markit's own primer on CDS transactions states that every CDS contract is defined by the following:

(a)     A reference entity (the underlying entity on which one is buying/selling protection on);

(b)     A reference obligation (the bond or loan that is being "insured");

(c)     A term/tenor (usually 5 years);

(d)     A notional principal; and

(e)     Credit events (the specific events triggering the protection seller to pay the protection buyer).

169.     Because of the high degree of commoditization of CDS contracts, buy-side participants predominantly use price as the basis for purchasing decisions.

170.     There are significant barriers to entry for potential sell-side participants, clearing houses, and exchanges.  Potential sell-side participants are required to have significant reserves

of capital in order to satisfy capital requirements dictated by clearing houses. Furthermore, potential clearing houses and exchanges require licenses from Markit (with respect to its CDS indices and pricing information) and ISDA (to use its standard agreements). Without licenses, clearing houses and exchanges are incapable of offering a viable platform through which to clear or trade CDS.

171.     Dealer Defendants exerted control over Markit, DTCC, ICE and ISDA based on their common ownership of and membership on the boards of directors and key committees of these entities. The boards and committees of these entities held regular meetings, which provided ample opportunity for Dealer Defendants to conspire.

172.     Dealer Defendants, by and through their control of ISDA, ICE, Markit, and DTCC have been able to exclude new entrants on the sell side, prevent the development of exchanges, and limit the success of competitive clearing houses. As a result, they face no other significant competitors in the CDS market.

## CLASS ACTION ALLEGATIONS

173.     Plaintiff brings this action as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. The "Class" is defined as:

> All "buy side" persons or entities which bought or sold CDS contracts directly from "sell side" Dealer Defendants (or their subsidiaries and/or affiliates), beginning as early as January 1, 2008 and continuing to the present ("Class Period"). Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and coconspirators, whether or not named in this Complaint, and the United States government.

174.     Plaintiff believes that there are at least hundreds, if not thousands, of Class members as described above, the exact number and their identities being known by Defendants,

making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

175.    There are questions of law and fact common to the Class, which  relate to existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize CDS bid-ask spreads in the United States in violation of the Sherman Act;

(b)    The identity of the participants in the conspiracy;

(c)    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether Defendants conspired to obtain and maintain their sell side monopoly in the CDS market in violation of the Sherman Act;

(e)    Whether Defendants engaged in unlawful conduct to prevent potential market entrants from introducing clearinghouses in the CDS market in violation of the Sherman Act;

(f)    Whether Defendants engaged in unlawful conduct to prevent the introduction of exchange trading in CDS in violation of the Sherman Act;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class; and

(h)    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

176.    Plaintiff is a direct purchaser of CDS contracts, and its interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class; has claims that are typical of the claims of the Class members; and will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

177.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

178.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

179.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that number individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as the ones asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

180.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

181.    Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were conspiring to control the CDS market, with the purpose and effect of artificially inflating CDS bid-ask spreads to buy and sell CDS in the United States.  Furthermore, price-fixing conspiracies are inherently self-concealing.

182.    Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

183.    Defendants and their co-conspirators were able to affirmatively conceal their conspiracy by, among other things, engaging in secret communications and, in the case of the Dealer Defendants, using their membership on the boards of Markit, ISDA, DTCC and ICE to facilitate these secret communications.

184.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff and the Class's claims have been tolled.

185.    Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until, at the earliest, July 14, 2009, when news reports announced that the DOJ opened an investigation against Markit concerning, among other things, whether (1) Markit had unfair access to CDS pricing information; and (2) Markit's bank shareholders received advantages as owners and providers of prices and trading patterns for CDS.  Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of

secrecy employed by the Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

186.     Further, reasonable due diligence could not have uncovered Defendants conspiracy because (1) the Defendants' trades and trading strategies are not public information; (2) clearing houses do not publish information concerning particular trading entities, including trading between dealer entities; and (3) the bilateral, non-exchange traded nature of the trades at issue further obscures what Defendants were, and are, doing at any particular time.

187.     As a result of the self-concealing nature of the price-fixing conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for each cause of action Plaintiff alleges.

## CLAIM ONE

### Sherman Act §1: Conspiracy to Restrain Trade

188.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

189.     Beginning at least as early as January 1, 2008, and continuing to the present date, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

190.      The contract, combination, and conspiracy consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to restrict ICE from clearing CDS trades for rival dealers, restrict potential sources of pricing information from providing timely, complete and accurate CDS price

information to customers or rival dealers, block entry of a competing clearinghouse, and block entry of a CDS exchange-traded platform, with the purpose and effect of artificially inflating CDS bid-ask spreads to buy and sell CDS in the United States.

191. Defendants accomplished these acts, in part, through their ownership and control of Markit, ISDA, ICE, and DTCC.

192. The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CDS market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conduct.

193. The conspiracy caused injuries to competition in the CDS market throughout the Class Period, including, among others: Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the CDS market; the supply of timely, complete and accurate CDS price information has been suppressed; the prices charged by Dealer Defendants to Plaintiff and the Class for CDS were artificially inflated; the prices of CDS sold by Plaintiff and the Class to Dealer Defendants were artificially depressed; and Plaintiff and the Class have been deprived of the benefits of innovation and openness that would have flowed from a competing clearinghouse and exchange trading.

194. As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property throughout the Class Period. Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

**RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, and that Plaintiff's counsel be appointed as Class counsel;

B.      That the unlawful conduct alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act;

C.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

E.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

F.      That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

DATED: August 12, 2013                    **FREED KANNER LONDON & MILLEN LLC**

/s/ Michael J. Freed
MICHAEL J. FREED
DONALD L. SAWYER
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
Facsimile:  224-632-4521
mfreed@fklmlaw.com
dsawyer@fklmlaw.com

*Of Counsel*

**LABATON SUCHAROW LLP**
LAWRENCE A. SUCHAROW
GREGORY S. ASCIOLLA
JAY L. HIMES
MATTHEW J. PEREZ
140 Broadway
New York, NY
Telephone: 212-907-0700
Facsimile:  212-818-0477
lsucharow@labaton.com
gasciolla@labaton.com
jhimes@labaton.com
mperez@labaton.com

*Counsel for Plaintiff and the Proposed Class*

**LOWEY DANNENBERG COHEN & HART, P.C.**
VINCENT BRIGANTI
White Plains Plaza, One North Broadway
White Plains, NY, 10601-2310
Telephone: 914-997-0500
Facsimile:  914-997-0035
VBriganti@lowey.com

*Of Counsel*